NOT RECOMMENDED FOR PUBLICATION
File Name: 15a0253n.06

**FILED**

Apr 07, 2015
DEBORAH S. HUNT, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| JEROME S. TANNENBAUM; DEBORAH H. TANNENBAUM | ) | |
| | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | **ON APPEAL FROM THE** |
| v. | ) | **UNITED STATES DISTRICT** |
| | ) | **COURT FOR THE MIDDLE** |
| FEDERAL INSURANCE COMPANY | ) | **DISTRICT OF TENNESSEE** |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

BEFORE:    COLE, Chief Judge; KEITH and BATCHELDER, Circuit Judges

**ALICE M. BATCHELDER, Circuit Judge.**    After a ten day trial, a jury sided with

Federal Insurance Company ("Federal") in an insurance coverage dispute with property owners

Jerome and Deborah Tannenbaum. Although the Tannenbaums claimed that strong winds had

caused significant damage to their property in Nashville, Tennessee, the jury determined that

landslides, which were excluded from policy coverage, were the primary catalyst for the damage,

as Federal had contended. The Tannenbaums appeal the district court's exclusion of one of their

expert witnesses and the district court's decision not to issue two jury instructions. For the

reasons that follow, we AFFIRM.

**I.**

In August 2009, the Tannenbaums took out a one-year insurance policy from Federal for

their property in Nashville, Tennessee. The policy, in relevant part, defines a "covered loss" as

including "all risk of physical loss to your house or other property covered . . . unless stated otherwise or an exclusion applies." One of the enumerated exclusions to coverage is "earth movement including volcanic eruptions, landslides, mud flows, and the sinking, rising or shifting of land." Wind damage, on the other hand, is not excluded from coverage. The policy also features a list of "Extra Coverages." Notably for this appeal, the policy covers "Rebuilding to code," which is defined as:

> After a covered loss, [] cover[ing] the necessary cost of conforming to any law or ordinance that requires or regulates:
> - the repair, replacement, or rebuilding of the damaged portion of your house or other permanent structure made necessary by the covered loss;
> - the demolition, replacement, or rebuilding of the undamaged portion of your house or other permanent structure necessary to complete the repair, replacement or rebuilding of the damaged portion of your house or other permanent structure; or
> - the demolition of the undamaged portion of your house or other permanent structure when your house or other permanent structure must be totally demolished.

Both parties stipulated to the terms of the policy at trial.

During the weekend of May 1-2, 2010, storms passed through Tennessee over the Tannenbaums' property while the Tannenbaums were not present. Although the parties dispute how the damage occurred, both sides agree that the storms damaged the property extensively. The Tannenbaums assert that violent winds caused the damage by uprooting trees and hurling them into the house, a theory which, if true, would entitle them to full coverage for the damage. Federal, on the other hand, through the analysis of its two primary claim adjusters, as well as several experts, concluded that landslides had caused the majority of the damage. The only wind damage Federal found was damage to the roof caused by a single fallen tree. Federal paid the Tannenbaums $58,418.50 for the tree damage caused by the wind, but denied coverage for all

remaining damage, since landslide damage was an enumerated exclusion from coverage under the policy.

On October 11, 2011, the Tannenbaums filed a complaint against Federal in the Circuit Court for Davidson County, Tennessee. The complaint raised four claims: 1) breach of contract; 2) failure to adjust the claim; 3) violations of the Tennessee Consumer Protection Act ("TCPA"); and 4) bad-faith refusal to pay. Federal removed the suit to the United States District Court for the Middle District of Tennessee on diversity grounds. In relevant part, Federal filed two motions in June 2013: a motion to bifurcate the trial into a phase for the breach-of-contract claims, and a phase for the TCPA and bad-faith claims; and a motion *in limine* to exclude the testimony of the Tannenbaums' expert witness Charles W. Howarth. In October 2013, the district court granted the motion to bifurcate, dividing the trial into a breach-of-contract phase and a bad-faith phase. The case then proceeded to trial on October 22, 2013, beginning with the breach-of-contract phase.

Although he never ruled on the motion in *limine*, the district judge stated his intention at the outset of the trial to defer Charles Howarth's testimony until the second phase of the trial. The Tannenbaums objected to this decision. On the sixth day of the trial of the breach-of-contract claim, the Tannenbaums called Charles Howarth to the stand, despite the district judge's previous statement. Federal objected, insisting that Howarth was the Tannenbaums' bad-faith witness and thus his testimony would be irrelevant to the breach-of-contract phase of the trial. The court sustained the objection.

After a ten day trial, the parties closed proof for the breach-of-contract phase of the trial. The court's clerk conducted an off-the-record charge conference to confer with counsel on the court's intended jury instructions. Before charging the jury, the court noted that it had filed each

party's proposed jury instructions. On November 5, 2013, the court charged the jury. The Tannenbaums objected to the lack of an instruction about the "Rebuilding to code" provision in the policy and the lack of an instruction on resolution of ambiguities in a contract.

That same day, the jury returned a verdict in favor of Federal on the breach-of-contract claim. Since the jury found that Federal had proved that the loss was primarily caused by landslides and not wind damage, as Federal had contended all along, there was no need for a second phase of the trial on the TCPA and bad-faith claims. The Tannenbaums appealed, contending that the district court erred by: 1) excluding testimony from their expert witness Charles Howarth; 2) not including a jury instruction on the "Rebuilding to code" provision; and 3) not including a jury instruction on resolution of contract ambiguity.

## II.

The Tannenbaums first argue that the district court erred by excluding testimony from their expert witness during the first phase of the bifurcated trial. We review for abuse of discretion the district court's determination to admit or exclude expert testimony, "recognizing, of course, that such review calls for deference to the district court's decision." *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 781 (6th Cir. 2002). We will not substitute our own judgment for that of the district court and will reverse an evidentiary decision "only where we are left with a definite and firm conviction that [the district court] committed a clear error of judgment." *Id.*

The Tannenbaums contended at trial that even though Charles Howarth would have been their "bad-faith" expert witness had the trial proceeded in just one phase, they had instructed him not to testify about bad-faith issues during the breach-of-contract phase of the bifurcated trial. Howarth, they argued, would have testified about whether Federal had met the applicable

standards for adjusting the type of policy the Tannenbaums had purchased. This testimony was necessary, they believed, because Federal had opened the door to the proper standard for adjusting insurance policies by eliciting testimony from its claim adjusters about how they normally view coverage during a claim adjustment. Howarth would have challenged Federal's claim adjusters' views on coverage by showing that the industry standard for policies of this type is one of coverage with the burden placed on the adjuster to determine if an exclusion applies.

The report submitted by Howarth to the court outlining his expert opinions, however, is littered with references to "bad-faith." Although he discusses the industry standards on claim adjustment in the report, these standards merely form the basis for his conclusion that Federal acted in bad-faith throughout the claim adjustment process. The district court had relegated all bad-faith argumentation to the second phase of the trial, if one were needed. There was no error in postponing the testimony of the Tannenbaums' bad-faith witness to the bad-faith phase, especially because even the proposed, potentially relevant testimony about industry standards would not have been helpful to the jury. *See Thompson v. State Farm Fire & Cas. Co.*, 34 F.3d 932, 941 (10th Cir. 1994) (affirming a district court's ruling which excluded testimony of an insurance industry expert comparing the insurance company's actions to the industry standard because the "expert testimony [wa]s offered on an issue that a jury is capable of assessing for itself").

**III.**

The Tannenbaums next contend that the district court erred by not including two of their proposed jury instructions in its charge to the jury. We review for abuse of discretion "[a] district court's refusal to give a specific requested jury instruction." *Fisher v. Ford Motor Co.*, 224 F.3d 570, 576 (6th Cir. 2000). An abuse of discretion is defined as a "definite and firm

conviction that the trial court committed a clear error of judgment." *Cincinnati Ins. Co. v. Byers*, 151 F.3d 574, 578 (6th Cir. 1998) (internal quotation marks omitted). "A party needs only a slim amount of evidence to support giving a jury instruction, but jury instructions must be reviewed as a whole to determine whether an instruction is necessary." *Taylor v. TECO Barge Line, Inc.*, 517 F.3d 372, 387 (6th Cir. 2008). "A party is not entitled to a new trial based upon alleged deficiencies in the jury instructions unless the instructions, taken as a whole, are misleading or give an inadequate understanding of the law." *Arban v. West Pub. Corp.*, 345 F.3d 390, 404 (6th Cir. 2003).

**A.**

The Tannenbaums first argue that the district court erred by not including a jury instruction on the "Rebuilding to code" provision of the insurance policy. They believe that the work required on their property to fix the damage from the storms would necessitate applying for, and paying for, permits. They point to a handful of references in the trial transcript mentioning permits. A few of these references are merely Federal's experts responding to questioning from the Tannenbaums' counsel, stating that such work would probably require a permit, although they had no idea what the locality's code stipulated. The other references are from Jerome Tannenbaum himself and one of the Tannenbaums' expert witnesses, stating generally that the Tannenbaums would need permits. In their brief, the Tannenbaums cite to multiple municipal code provisions showing that their city would have required permits. They never introduced any of these provisions, however, into the trial record.

A trial judge has authority to refuse to give a proposed instruction if insufficient evidence supports it. *Gruener v. Ohio Cas. Ins. Co.*, 510 F.3d 661, 664 (6th Cir. 2008). "A trial court may refuse to instruct the jury on an issue when there has been insufficient evidence presented to

support a jury finding on that issue." *Miller's Bottled Gas, Inc. v. Borg-Warner Corp.*, 56 F.3d 726, 736 (6th Cir. 1995). "To effectively charge a trial court with failure to provide an instruction, one must first show the presence of evidence in the record sufficient to support submission of that instruction." *Bucyrus-Erie Co. v. Gen. Prods. Corp.*, 643 F.2d 413, 420 (6th Cir. 1981).

Although only a "slim amount" of evidence is required to support a proposed jury instruction, allowing the Tannenbaums' claim here would strain the definition of "slim." During a ten day trial, the Tannenbaums can point to at most a handful of, and, more realistically, two, definitive statements about permits in the entire trial transcript. Without the specific code provisions introduced into evidence, the record simply does not demonstrate that the city would have required permits to rebuild. Given the lack of evidence on that topic, the district court did not err by refusing to give the instruction on the "Rebuilding to code" provision.

**B.**

The Tannenbaums argue finally that the district court erred by not including a jury instruction on resolving ambiguity in insurance contracts. The Tannenbaums proposed an instruction stating that ambiguous language in an insurance policy is always construed against the insurer and in favor of effecting coverage. They argue on appeal that the district court's decision removed from the jury the question of whether ambiguities in fact existed and, if so, the impact those ambiguities had on coverage for their losses.

The Tannenbaums' argument rests on a misapprehension of settled contract law in Tennessee, which we must apply because this case is premised on diversity jurisdiction. *See Grantham & Mann, Inc. v. Am. Safety Prods., Inc.*, 831 F.2d 596, 608 (6th Cir. 1987). Insurance policies are contracts and, thus, are "subject to the same rules of construction and enforcement as

apply to contracts generally." *McKimm v. Bell*, 790 S.W.2d 526, 527 (Tenn. 1990). "A court's initial task in construing a contract is to determine whether the language of the contract is ambiguous." *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002). The existence of an ambiguity in a written contract and its resolution are questions of law for a judge, not a jury. *Union Planters Corp. v. Harwell*, 578 S.W.2d 87, 92 (Tenn. Ct. App. 1978).

Although, in a rush of wishful thinking perhaps, the Tannenbaums argue that the jury *might* have found certain provisions of the contract ambiguous had the judge instructed them on contract ambiguity, this threshold inquiry is for the judge, not the jury. And the district court never found any provisions of the policy to be ambiguous. Further, in evaluating the Tannenbaums' arguments, we are convinced that there was not, in fact, any ambiguity in the policy. The Tannenbaums' proposed ambiguities are simply complaints about Federal's application of the policy to their claims disguised as purported problems with the contract language. Thus, even if the jury were the proper avenue for resolving contract ambiguities, the proposed instruction would not have helped the Tannenbaums.

## IV.

For the foregoing reasons, we AFFIRM the judgment of the district court.